MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2014 ME 39
Docket:      Ken-12-594
Argued:      November 19, 2013
Decided:     March 4, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

## PATRICIA A. McCOLLOR

v.

## FREDERICK J. McCOLLOR JR. et al.

LEVY, J.

[¶1]  Frederick J. McCollor, Jr. and Cheryl Stanton, who are brother and sister, appeal from a judgment entered in the Superior Court (Kennebec County, *Mills, J.*) in favor of their mother, Patricia A. McCollor, on her claims for violation of the Improvident Transfers of Title Act (ITTA or Act), 33 M.R.S. §§ 1021-1025 (2013), undue influence, and breach of fiduciary duty.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  The court found the following facts, which are supported by competent evidence in the record.  The late Frederick J. McCollor, Sr., born in 1940, and Patricia A. McCollor, born in 1944, were married in 1964.  They had two children: Cheryl Stanton, born in 1965, and Frederick J. McCollor, Jr., known as John, born in 1969.

2

[¶3]  Frederick and Patricia had lived in Maine since 1967 and moved to a house at 7 Lawrence Street in Waterville in 1996.  In 2006, Frederick's health began to deteriorate, and he suffered headaches, dizziness, loss of balance, depression, and a constant fear of falling.  By the end of 2006, Frederick stopped driving.  In September 2008, he was diagnosed with inoperable brain tumors and lung cancer and began chemotherapy treatment.  Frederick was in pain, depressed, and told Patricia that he was not ready to die.

[¶4]  As Frederick's condition worsened, Patricia became his primary caregiver, feeding him, transporting him, and helping him with daily activities.  During this time, John also assisted Patricia with Frederick's transportation and tasks around the house.  Patricia's relationship with her daughter, Cheryl, had been strained since Cheryl was seventeen years old, and communication between them was minimal.

[¶5]  On October 20, 2008, John informed Patricia that her and Frederick's home was at risk of being seized by MaineCare to pay for Frederick's medical bills and that Frederick and Patricia had to transfer the title of the house to John and Cheryl to avoid eviction.  Later that day, John drove Frederick and Patricia to the office of Gateway Title of Maine, where they signed a deed transferring the home to John and Cheryl.  The parties dispute whether Frederick and Patricia met with John Kirk, an attorney employed by Gateway Title, at this meeting.

[¶6] Over a year later, in June 2010, Frederick suffered a stroke and was hospitalized for a month. Cheryl traveled to Maine to visit her father and stayed in the house. During this time, the relationship among Patricia, John, and Cheryl became increasingly strained. After a dispute in which John accused Patricia of selling Frederick's belongings, Patricia came home to find several interior doors padlocked, effectively preventing her from entering the living and dining rooms as well as certain areas of the house previously occupied by Frederick. Patricia filed a complaint in the District Court against John and Cheryl seeking injunctive relief regarding the use and possession of the house. In March 2011, the parties agreed to a preliminary injunction pursuant to which no party was to sell, remove, or encumber the personal property located in the house, and access to the opposing parties' claimed areas of the house was to be coordinated through counsel.

[¶7] Patricia later learned that John had obtained a power of attorney from Frederick five days after Frederick's stroke and had opened a joint bank with Frederick. John transferred over $22,000 from Frederick's account to this joint account; the majority of the funds were transferred after Frederick's death in December 2010 when John's power of attorney had terminated. John withdrew all of the funds in the joint account after Frederick's death. In October 2010, two years after the deed conveyance, Patricia learned that MaineCare would not have seized the house in an effort to collect on Frederick's unpaid medical bills as John

4

had represented and that, at most, MaineCare would have put a lien on the property.

[¶8] Frederick died intestate in December 2010. In 2011, Patricia brought suit in the Superior Court, both individually and as personal representative of Frederick's estate, against John and Cheryl for violation of the ITTA, undue influence, conversion, and breach of fiduciary duty.

[¶9] In October 2012, following a jury-waived trial, the court entered a judgment concluding that the transfer of the real property was obtained through undue influence and was therefore void pursuant to the ITTA. The court further found that John had breached his fiduciary duty as the holder of Frederick's power of attorney with regard to his transfer and use of Frederick's money. As remedies, the court ordered that the 7 Lawrence Street property be held in constructive trust for the benefit of Frederick's estate, and that John reimburse the estate in the amount of $21,198.90 plus pre- and post-judgment interest.[1]

[¶10] Patricia subsequently filed a motion to amend the judgment, and John and Cheryl filed a motion seeking to amend the findings of fact and amend the judgment, for additional findings of fact, and for a new trial. In November 2012, the court amended the judgment to further require that John and Cheryl return to

---

[1] The remedies described here incorporate the court's November 2012 amended judgment, which also amended the damages award to account for a clerical error.

Frederick's estate the personal property they removed from 7 Lawrence Street. John and Cheryl filed this appeal.

## II. DISCUSSION

A.     The Presumption of Undue Influence Pursuant to the ITTA

[¶11]   The ITTA "protects elderly individuals against making transfers of property as a result of undue influence." *Sylvester v. Benjamin*, 2001 ME 48, ¶ 11, 767 A.2d 297.   The Act establishes a presumption of undue influence when an elderly dependent person transfers property to another person in the context of a confidential or fiduciary relationship for less than full consideration:

> In any transfer of real estate or major transfer of personal property or money for less than full consideration or execution of a guaranty by an elderly person who is dependent on others to a person with whom the elderly dependent person has a confidential or fiduciary relationship, it is presumed that the transfer or execution was the result of undue influence, unless the elderly dependent person was represented in the transfer or execution by independent counsel.

33 M.R.S. § 1022(1).   If the transferor successfully establishes the presumption of undue influence by a preponderance of the evidence, and the person benefiting from the transfer fails to rebut the presumption, the transferor "is entitled to avoid the transfer." *Id.*

[¶12]   John contends that the court erred in finding that Patricia successfully established the presumption of undue influence because, he claims, Patricia was

6

not an "elderly dependent person" as that term is defined by the statute[2] and because Patricia and Frederick were represented by independent counsel in the execution of the deed. We address each contention in turn.

1.    Whether Patricia Qualifies as an Elderly Dependent Person

[¶13]  There is no dispute that Patricia, who was sixty-four years old at the time of the execution of the deed in October 2008, qualifies as an "elderly person" pursuant to the ITTA. *See* 33 M.R.S. § 1021(2) (defining "elderly person" as "a person who is 60 years of age or older"). The Act defines the term "elderly *dependent* person" as "an elderly person [who is] wholly or partially dependent upon one or more other persons for care or support, either emotional or physical, because the elderly person . . . [s]uffers from a significant limitation in . . . emotional or mental functioning . . . ." 33 M.R.S. § 1021(1)(A). We review the court's factual finding that Patricia was dependent on John for clear error and will uphold it unless there is no competent evidence in the record supporting such a finding. *See Sylvester*, 2001 ME 48, ¶ 9, 767 A.2d 297.

[¶14]  Contrary to John's contention, ample evidence in the record supports the court's finding that Patricia was at least "partially dependent" upon John. The court found credible Patricia's testimony that she suffered from considerable stress

---

    [2]  John does not challenge the court's finding that Frederick was an elderly dependent person for purposes of the ITTA.

and a "rollercoaster" emotional state during the course of Frederick's illness, that she attempted in vain to obtain information from John about Frederick's health care, and that she depended on John for emotional support, advice, and assistance in taking care of Frederick. *See Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903 ("Determinations of witness credibility are uniquely within the fact-finder's authority . . . ."). Patricia further testified as to her trust in John's information regarding the transfer of the house, her fear of losing her home at a time when Frederick was ill, and her shock in learning that MaineCare would not have seized the house as John had led her to believe. Further, it was John who made all of the necessary arrangements to complete the transfer, including driving his parents to Gateway Title's office that very same day. The court did not err in finding that Patricia qualified as an "elderly dependent person" for purposes of the ITTA.

2.     Whether Frederick and Patricia Had Independent Counsel

[¶15]  John also contends that the court erred by excluding the evidence of a Gateway Title document purporting to show that Attorney John Kirk, an employee of Gateway Title, met with Frederick and Patricia prior to the execution of the deed. We conclude that the court did err in excluding the document for lack of foundation, but that the error was harmless.

[¶16]  In reviewing a trial court's ruling regarding the admissibility of a business record, "we review foundational findings for clear error and the ultimate

determination of the record's admissibility for abuse of discretion." *Beneficial Me. Inc. v. Carter*, 2011 ME 77, ¶ 9, 25 A.3d 96; *see also Bank of America, N.A. v. Barr*, 2010 ME 124, ¶ 17, 9 A.3d 816.

[¶17]    Pursuant to the Maine Rules of Evidence, a business record is admissible as an exception to the hearsay rule if the party offering the evidence lays a proper foundation through testimony of "the custodian or other qualified witness" showing that

> (1) the record was made at or near the time of the events reflected in the record by, or from information transmitted by, a person with personal knowledge of the events recorded therein;
> (2) the record was kept in the course of a regularly conducted business;
> (3) it was the regular practice of the business to make records of the type involved; and
> (4) no lack of trustworthiness is indicated from the source of information from which the record was made or the method or circumstances under which the record was prepared.

*State v. Nelson*, 2010 ME 40, ¶ 9, 994 A.2d 808 (quotation marks omitted); M.R. Evid. 803(6).[3]  "A qualified witness is one who was intimately involved in the

---

[3] The business records exception in the Maine Rules of Evidence provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . .
>
> **(6) Records of regularly conducted business.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business, and if it was the regular practice of that business to make the memorandum, report, record, or data compilation, all as shown by

daily operation of the business and whose testimony showed the firsthand nature of his knowledge." *Barr*, 2010 ME 124, ¶ 19, 9 A.3d 816 (quotation marks omitted) (alteration omitted). A qualified witness can provide the proper foundation even if the witness "did not prepare or supervise the preparation of the record" and was not the custodian of the record at the time of its creation. *Id.*

[¶18] Although Attorney Kirk was not the custodian of and did not prepare the document, his testimony demonstrated that he was intimately involved in and had first-hand knowledge of Gateway Title's business operations. Attorney Kirk was therefore a qualified witness for purposes of Rule 803(6). Because the evidence in the record established that other requirements of Rule 803(6) were satisfied, the Gateway Title document should have been admitted.

[¶19] Even so, this document, titled "Order Summary" and consisting of a single printout, stating, "10/15/2008 03:42 PM . . . parents spoke with John [Kirk] and deed Ok per John [Kirk]," established nothing beyond that Attorney Kirk had a conversation with Frederick and Patricia. Kirk testified that he had no recollection

---

the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 903(12) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

M.R. Evid. 803.

of his conversation with the couple. This evidence falls far short of satisfying the ITTA's definition of "[i]ndependent counsel" as "an attorney retained by the elderly dependent person to represent only that person's interests in the transfer." 33 M.R.S. § 1021(3). There was simply no evidence in the record that Frederick and Patricia "retained" Kirk as their attorney or that Kirk represented only their interests in the transfer.

[¶20]  The court did not err in finding that Frederick and Patricia did not have independent counsel for purposes of the ITTA.  Any error in excluding the order summary was harmless.  M.R. Civ. P. 61; *see also Shaw v. Packard*, 2005 ME 122, ¶ 13, 886 A.2d 1287.[4]

B.    The Return of Personal Property

[¶21]  The ITTA defines a "[m]ajor transfer of personal property or money" as "a transfer of money or items of personal property which represent 10% or more of the elderly dependent person's estate."  33 M.R.S. § 1021(5).  John contends that the court erred in ordering the return of the personal property that John and Cheryl had removed from Frederick and Patricia's house because the value of the property did not amount to a "major transfer" pursuant to the ITTA.

---

[4]  We are not persuaded by and do not separately address John's additional arguments regarding the court's finding of undue influence.

[¶22] John's contention is without merit. The warranty deed executed by Frederick and Patricia conveyed not only the land and buildings located at 7 Lawrence Street but also "the contents therein." As such, the real estate and the personal property were conveyed in a single transfer. The court's rescission of the transfer included the personal property contained in the house.

C.     Determination of Damages

[¶23] John also argues that the court erred in its determination of damages by ignoring contradictory evidence. We will vacate a damages award "only when there is no competent evidence in the record to support the award." *Woodworth v. Gaddis*, 2012 ME 138, ¶ 9, 58 A.3d 1109 (quotation marks omitted). Here, in determining the amount of damages, the court was free to credit—over other contradictory evidence—the summary exhibit of Frederick's account and related testimony introduced by Patricia. *See Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 12, 69 A.3d 416 ("No principle of appellate review is better established than the principle that credibility determinations are left to the sound judgment of the trier of fact." (quotation marks omitted)). Further, the court's damages award was based in part on the amount that John withdrew from Frederick's account after Frederick had died and John's power of attorney had terminated. John did not dispute this amount. The court's damages award was supported by ample evidence in the record.

The entry is:

Judgment affirmed.

––––––––––––––––––––––––

**On the briefs:**

Walter F. McKee, Esq., and Matthew D. Morgan, Esq., McKee Billings, LLC, P.A., Augusta, for appellants Frederick J. McCollor, Jr., and Cheryl Stanton

Michael J. Levey, Esq., Levey, Wagley & Putnam, P.A., Winthrop, and Peter B. Bickerman, Esq., Readfield, for appellee Patricia A. McCollor

**At oral argument:**

Walter F. McKee, Esq., for appellants Frederick J. McCollor, Jr., and Cheryl Stanton

Peter B. Bickerman, Esq., for appellee Patricia A. McCollor

Kennebec County Superior Court docket number RE-2011-39
FOR CLERK REFERENCE ONLY